1

2                                                    **E-Filed 5/12/10**

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                              **SAN JOSE DIVISION**

11

12   JOHN SCHWARZKOPF,                    Case Number C 08-2715 JF (HRL)

13                      Plaintiff,        ORDER[1] (1) GRANTING
                                          DEFENDANT'S MOTION FOR
14        v.                              SUMMARY JUDGMENT AND (2)
                                          DENYING PLAINTIFF'S CROSS-
15   INTERNATIONAL BUSINESS MACHINES,     MOTION FOR SUMMARY
     INC; AND DOES 1 THROUGH 20,          ADJUDICATION
16
                        Defendants.       [re:  doc. nos. 37 & 44]
17

18

19

20        Defendant International Business Machines, Corp. ("IBM") moves for summary

21   judgment.  Plaintiff John Schwarzkopf ("Schwarzkopf") asserts claims for: (1) breach of

22   contract, (2) breach of the covenant of good faith and fair dealing, (3) fraud, (4) promissory

23   estoppel, and (5) unfair, unlawful, and fraudulent business practices under California's Unfair

24   Competition Law ("UCL").  Schwarzkopf cross-moves for summary adjudication with respect to

25   the applicability of the covenant of good faith and fair dealing to IBM's exercise of discretion

26   under the purported contract.  Both motions require the Court to determine whether the sales

27   ──────────────────

28        [1] This disposition is not designated for publication in the official reports.

1  commission plan at issue constituted an enforceable contract between the parties.  The Court has

2  considered the moving and responding papers and the oral argument of counsel at the hearing on

3  April 9, 2010.  For the reasons set forth below, IBM's motion will be granted, and

4  Schwarzkopf's motion will be denied.

5  **I. BACKGROUND**

6  The underlying facts are straightforward and unless otherwise noted are not in dispute.  In

7  January 2006, IBM hired Schwarzkopf as a Lotus Brand software sales representative.

8  Schwarzkopf earned a base salary plus commissions based upon his sales revenue.  The

9  commission structure was governed by a "Leveraged Sales Incentive Plan," the specific terms of

10  which were set forth each year in an "Incentive Plan Letter," commonly known as a "Quota

11  Letter."

12  In 2007, IBM altered its commission structure by switching from annual to semi-annual

13  sales quota periods.  Schwarzkopf's first-line manager, Jolee Blackman ("Blackman") was

14  responsible for setting his sales quota of $968,450 for January 1, 2007 through June 30, 2007.

15  To account for the transition, this first period quota represented 35% of Schwarzkopf's projected

16  annual quota.[2]  (Def.'s Mot. Summ. J. 3:3-5 (citing Blackman Decl.  ¶¶ 3-7; Ex. A).)

17  Schwarzkopf's 2007 Quota Letter ("Quota Letter"), received in or around January 2007,

18  provided details regarding his sales territory and account assignments and outlined the terms of

19  his commission eligibility.  Schwarzkopf confirmed his receipt and acceptance of the terms of the

20  Quota Letter by digitally signing it and transmitting it back to IBM.[3]

21

22
23  [2] IBM notes that the low quota set for the first half of 2007 was in part based on input that
Blackman received from Schwarzkopf regarding his anticipated sale of Lotus software to Cisco
24  Systems in the second half of 2007.  (Def.'s Opp'n to Pl.'s Mot. Summ. Adjud 5:20-27 (citing
Pl.'s Response to Request for Admission 17; Blackman Decl. ¶ 6).).

25
26  [3] IBM acknowledges that a sales representative would not have a sales territory or quota
without first "accepting" the terms of the Quota Letter.  (*See* Vinick Decl. In Support of Pl.'s
27  Opp'n to Def.'s Mot. Summ. J., Martinotti Dep. 132:7-135:3).  IBM does not agree, however,
that such "acceptance" indicates the existence of a contract. (*See, e.g.*, Def.'s Reply to Pl.'s
28  Opp'n to Def.'s Mot. Summ. J. 6:1-7.)

Case No. C 08-2715JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY ADJUDICATION
(JFEX2)

1    The Quota Letter described the terms of Schwarzkopf's 2007 Sales Incentive Plan.  It

2  contained two clauses that are central to the dispute at hand.  The "Right to Modify or Cancel"

3  clause stated expressly that the Incentive Plan did not constitute a contract and reserved IBM's

4  right to adjust the terms of the Plan or cancel up until the time that a commission had been

5  earned.  It stated in relevant part:

6         **Right to Modify or Cancel**: The Plan does not constitute an express or implied
          contract or a promise by IBM to make any distributions under it.  IBM reserves
7         the right to adjust the Plan terms, including but not limited to any quotas or target
          incentives, or to cancel the Plan, for any individual or group of individuals, at any
8         time during the Plan period up until any related payments have been earned under
          its terms.

9  (Vinick Decl. In Support of Pl.'s Mot. Summ. Adjud., Ex. L at P000010).  The "Significant

10  Transactions" clause reserved the right of IBM, in its sole discretion, to adjust the commission

11  payment for certain sales transactions.  It stated:

12         **Significant Transactions**: IBM reserves the right to review and, in its sole
           discretion, adjust incentive payments associated with transactions which (1) are
13         disproportionate when compared with the territory opportunity or quota size; or
           for which (2) the incentive payments are disproportionate when compared with
14         the individual's performance contribution towards the transactions.

15   (*Id.* at P000011).  The Quota Letter did not refer directly to any type of commission "cap" or

16  percentage in excess of quota that would result in a reduced commission.

17    One of Schwarzkopf's major client accounts was Cisco Systems, Inc. ("Cisco").  Between

18  the spring of 2006 and June 30, 2007, Schwarzkopf devoted a significant percentage of his time

19  to arranging the sale of several million dollars of Lotus Brand products to Cisco ("the Cisco

20  deal").  In March 2007, while work on the Cisco deal was ongoing, a colleague told Schwarzkopf

21  that IBM had a "200 percent clause" pursuant to which it limited commissions on large deals.

22  Concerned that this might affect his expected commission on the Cisco deal, Schwarzkopf raised

23  the topic with several people, including Blackman; Dan Rolla ("Rolla"), IBM's account manager

24  for the Cisco account; and Pam Chandor ("Chandor"), the Global Sales Executive for Portal

25  Software for the Lotus division.  In turn, Blackman contacted Dan Pitts ("Pitts"), the Western

26  Region Lotus Business Unit Executive, and Chandor contacted Jason Risley ("Risley"),

27  Workplace Portal and Collaboration Software Sales Manager for the Southwest Region.

28

3

1    Schwarzkopf also emailed Whit Hardin ("Hardin"), IBM's Incentive Plan Analyst for the

2    software group.

3           Schwarzkopf received a number of responses to these inquiries.[4]  Hardin responded by

4    email and included an excerpt of the Significant Transactions clause, explaining:

5           [The Software Group] has used a standardized approach to this policy in the past
            which was referred to as the "200% Rule". The executive team is looking to
6           institute a comparable consistent approach for 2007 on how managers will
            administer the Significant Transaction clause, but it has not yet been fully
7           approved and announced. So, managers are expected to and have the ability to
            adjust either how much revenue flows to a given [sales] rep or the final
8           commission payment based on the clause.

9    (Def.'s Mot. Summ. J. 5:6-20 (citing Blackman Decl. Ex. 4; Pl. Dep. Ex. 3, 23).)  Hardin also

10   pointed Schwarzkopf to IBM's "On-line Earnings Estimator" to help him calculate his potential

11   commission.  The Earnings Estimator provides a disclaimer to all who access it, stating in

12   relevant part that "This application is **provided for earnings estimation purposes only**...

13   **Actual incentive sales payments may be different than the numbers produced here.  Use of**

14   **this calculator is not a guarantee you will receive the incentive payment you estimate.**"

15   (Def.'s Opp'n to Pl.'s Mot. Summ. Adjud. 3:9-16 (citing Pl. Dep. 177:23-178:7; Blackman Decl.

16   ¶ 10, Ex. B) (emphasis in original).)  Rolla responded that he was unaware of any 200% Rule,

17   but he suggested that Schwarzkopf review his compensation plan.  The other responses similarly

18   confirmed that there was no active "200% Rule," although several referenced the Significant

19   Transactions clause.  No one told Schwarzkopf affirmatively that his commission was likely to

20   be reduced pursuant to the clause.[5]  Schwarzkopf even received words of encouragement, such as

21

_____

22          [4] IBM points out that the Quota Letter itself advises employees not to rely on statements
     made by management regarding compensation.  (Def.'s Opp'n to Pl.'s Mot. Summ. Adjud. 4:17-
23   25 (quoting Schwarzkopf Dep. Ex. 1: "[D]ecisions regarding changes to IBM's programs,
     practices, or policies are generally not discussed or evaluated below the highest levels of
24   management.  Managers ... below such levels ... are [not] in a position to advise any employee
     on, or speculate about, future plans.  Employees should make no assumptions....").)
25

26          [5] Specifically, Blackman told Schwarzkopf that she did not know how his commission
     would be calculated and that he should try to get support from upper-line management.  She
27   advocated on his behalf in an email to Pitts, which states, "[w]e need to get, in writing, a
     commitment to pay John for the full amount earned on the Cisco transaction." (Pl.'s Opp'n to
28
                                               4

1    "maximize your deal buddy!" (Pl.'s Opp'n to Def.'s Mot. Summ. J. 3:21-24 (citing Chandor

2    Dep. Ex. 58).)

3         Based on these responses and the fact that he found no mention of a "cap" or "200% Rule

4    in his Quota Letter, Schwarzkopf concluded that the Cisco deal would not be subject to the

5    Significant Transaction clause.[6]  Schwarzkopf sought to close the sale and maximize revenue and

6    his anticipated commission before the end of the first quota period.  As a result of Schwarzkopf's

7    efforts and the additional involvement of other team members and senior executives, the Cisco

8    deal closed on June 30, 2007 for a total sale price of $32,093,041.  Under the terms of the Quota

9    Letter, without adjustment, Schwarzkopf would have earned a commission of $1,537,032.93.

10   (Pl.'s Opp'n to Def.'s Mot. Summ. J. 6:23-24 (citing Martinotti Dep. Ex. 72; David Dep. Vol. II,

11   Ex. 49).)  The "Earnings Estimator" also showed Schwarzkopf that he would earn in excess of

12   $1.5 million.  However, IBM decided to invoke its discretion under the Significant Transactions

13   Clause and adjust Schwarzkopf's commission.  Schwarzkopf ultimately was paid $551,647.

14        In determining the appropriate commission for the Cisco deal, IBM sought to achieve

15   "parity" among salespeople in the region.  Upon notice that Schwarzkopf had achieved

16   approximately 1077% of his quota for the first half of 2007, Rick Martinotti ("Martinotti"), the

17   Software Group Field Finance and Planning Manager, alerted Amy David ("David"), the

18   Regional Vice President, and Michael Pray ("Pray"), Business Unit Executive for the region, that

19   they would have to make a "very tight business case" to explain "why being 1000% [over quota]

20   makes business sense."  Martinotti directed them to exercise management discretion over the

21

22   Def.'s Mot. Summ. J. 3:21-24 (citing Blackman Dep. Ex. 3).)  Pitts similarly said that he
     believed Schwarzkopf should be paid "in full" and agreed to advocate for him.  Pitts sent a letter
23   to the Vice President of IBM Lotus Software seeking clarification on the application of the
     Significant Transaction clause and seeking "agreement that we will pay [Schwarzkopf] 100% of
24   his commission on the [Cisco deal]." (*Id.* 4:1-5 (citing Pitts Dep. Ex. 33).)  Chandor told
     Schwarzkopf she believed he should be paid in full and included an email string that she had
25   initiated with Risley.  The email string referenced the Significant Transaction Clause. (*Id.* 4:6-11
     (citing Chandor Dep. Ex. 58).)
26

27        [6] IBM properly objects to Schwarzkopf's subjective belief to the extent that it is offered
28   as opinion as to the legal effect of the clause.

                                              5

1  commission.  (Pl.'s Mot. Summ. Adjud. 8:16-8:6 (citing David Dep. Vol. II, Dep. Ex. 72; David

2  Dep. Vol. II, Ex. 40).)  David asked Pray to provide recommendations for commissions for

3  several sales reps in his region who had exceeded their quotas.  Pray contacted Blackman to tell

4  her that full payment for Schwarzkopf on the Cisco deal "would not happen;" he asked her to

5  review Schwarzkopf's commission and relative contribution and to suggest "what would be fair

6  and equitable pay."  (*Id.* (citing Blackman Dep. 151:24-152:10).)  Based in part on the low 35%

7  quota that had been set for the first half of 2007, Blackmun calculated a suggested commission of

8  $620,799, which Pray approved.  David ultimately rejected this amount and decided to apply a

9  "300% Rule" that was scheduled to go into effect for the second quota period beginning July

10 2007,[7] resulting after adjustments in Schwarzkopf's final commission of $551,647 for the Cisco

11 deal.

12     IBM did  not provide any type of written guidelines or guidance and training for its

13 managers with respect to implementation of the Significant Transactions clause.  (Pl.'s Mot.

14 Summ. Adjud. 8:8-14 (citing David Dep. Vol. I 21:3-21; Pray Dep. Vol. I 76:3-9; Blackman Dep.

15 63:5-12).)  Blackman used her own methodology to arrive at her recommended commission of

16 $620,799.  (*Id.* (citing Blackman Dep. 144:18-145:9).)  David did not base her decision to apply

17 the "300% Rule" on any personal knowledge or information about Schwarzkopf's work, but

18 rather believed that its application would achieve parity across the region's salespeople. (*Id.*

19 (citing David Dep. Vol. I 31:7-21; 36:20-37:2).)

20      Schwarzkopf concedes that the Significant Transactions clause afforded IBM discretion

21 in implementing incentive payments for significant transactions.  (*See, e.g.*, Pl.'s Opp'n to Def.'s

22 Mot. Summ. J. 7:9-22).  Nonetheless, he seeks summary adjudication with respect to the single

23

24     [7] In May 2007, IBM had announced "a new commission achievement calculation method
25 for any large transaction that, by itself, is greater than 300% of an employee's 6 month quota."
   The policy was to go into effect on July 1, 2007 and technically did not apply to the preceding
26 quota period. (Pl.'s Mot. Summ. Adjud. 10:4-8 (citing David Dep. Vol. II, Ex. 48); Def.'s Opp'n
   to Pl.'s Mot. 6:13-17, fn.5 (citing David Decl. ¶ 27).) David applied the "300% Rule" to another
27 similarly situated salesperson, referred to as Stacey G., who also had closed a large deal above
28 quota in the first period of 2007.  (Def.'s Opp'n to Pl.'s Mot. Summ. Adjud. 6:13-17).

6

legal question of whether the implied covenant of good faith and fair dealing applies to an

employer's exercise of discretion under a contract.  Arguing that it does, Schwarzkopf contends

that the subsequent question of whether IBM violated the covenant of good faith and fair dealing

in exercising its discretion pursuant to the Significant Transactions clause in this case is a fact-

based determination inappropriate for summary judgment.

IBM argues that because the Quota Letter did not constitute a contractual agreement, the

implied covenant of good faith and fair dealing is inapplicable.  Alternatively, it contends that

even if there was a contract, it acted pursuant to the ample discretion built into the agreement,

rendering Schwarzkopf's breach of contract and ancillary claims untenable as a matter of law.

## II.  LEGAL STANDARD

Summary judgment should be granted only when there are no genuine issues of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that

might affect the outcome of the case under the governing law.  *Id.* at 248.  There is a genuine

dispute about a material fact if there is sufficient evidence for a reasonable jury to return a verdict

for the nonmoving party.  *Id*; *Dark v. Curry County*, 451 F.3d 1078, 1082 (9th Cir. 2006) ("the

nonmoving party simply is required to show specific facts ... that present a genuine issue worthy

of trial.").

The moving party bears the initial burden of informing the Court of the basis for the

motion and identifying the portions of the pleadings, depositions, or other evidence that

demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  If the moving party would not bear the ultimate burden of persuasion at trial, it

must either produce evidence negating an essential element of the nonmoving party's claim or

defense or show that the nonmoving party does not have enough evidence of an essential element

to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,

210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets its initial burden, the burden

shifts to the nonmoving party to present specific facts showing that there is a genuine issue of

material fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

7

1       The evidence and all reasonable inferences must be viewed in the light most favorable to

2  the nonmoving party.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

3  630-31 (9th Cir. 1987).  Summary judgment thus is not appropriate if the nonmoving party

4  presents evidence from which a reasonable jury could resolve the material issue in its favor.

5  *Liberty Lobby*, 477 U.S. at 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

6                          **III.  DISCUSSION**

7       The Court first must resolve the question of whether the Quota Letter created an

8  enforceable contract.  Both parties' motions depend upon the proper legal interpretation of the

9  Quota Letter.  The Court concludes that the Quota Letter did not constitute a contract, and that

10  even if it did, IBM's decision to reduce Schwarzkopf's commission was within the bounds

11  allowed by the Letter's express terms.

12      **A.**      **The 2007 Quota Letter was not a contract**

13       Two basic prerequisites for contract formation are the existence of mutual consent and

14  terms that are "sufficiently definite" so that "the performance promised is reasonably certain."

15  *Weddington Productions, Inc. v. Flick*, 60 Cal. Appl. 4th 793, 811 (1998).  *See also* Rest. 2d

16  Contracts §§ 18, 33.  The Court must be able to ascertain the scope of the duty it is asked to

17  enforce.  *See Ladas v. Cal. State Automobile Assn.*, 19 Cal. App. 4th 761, 770 (1993); Cal. Civ.

18  Code § 3390 (An agreement cannot be specifically enforced if its terms "are not sufficiently

19  certain to make the precise act which is to be done clearly ascertainable.").  The Court interprets

20  the contract as a whole, "so as to give effect to every part, if reasonably practicable, each clause

21  helping interpret the other." Cal. Civ. Code § 1641.  *See also Brobeck, Phleger & Harrison v.*

22  *Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979) (The court derives the meaning of a contract "not

23  from a consideration of the words alone but from a reading of the entire contract.").

24       When the agreement at issue is reduced to writing, the Court should ascertain the intent of

25  the parties, if possible, based on the writing alone.  Cal. Civ. Code § 1639.  However, "[e]ven if

26  the written agreement is clear and unambiguous on its face, the trial judge must receive relevant

27  extrinsic evidence that can prove a meaning to which the contract is 'reasonably susceptible.'"

28  *Brobeck*, 602 F.2d at 871 (citing *Pacific Gas and Electric Co. v. G. W. Thomas Drayage Co.*, 69

1   Cal.2d 33, 37 (1968)).

2      Schwarzkopf argues that the 2007 Quota Letter meets the prerequisites for contract

3   formation.  First, the Quota Letter contains detailed and definite terms regarding compensation,

4   Schwarzkopf's sales territory, and the duration of the plan.  Second, IBM presented the Quota

5   Letter to Schwarzkopf and required a digital signature as proof of his assent to its terms.  (Pl.'s

6   Mot. Summ. Adjud. 15:8-18 (citing Schwarzkopf Dep. 109:9-21; Vinick Dec. Ex. L).)  "Taken

7   as a whole," the Quota Letter sets forth nine pages of detailed information specific to

8   Schwarzkopf's sales quota, territory, and commission arrangement; the last two pages contain the

9   "disclaimer" section including the "Right to Modify or Cancel" and "Significant Transaction"

10  clauses.  Schwarzkopf argues that an employee examining the Quota Letter's terms and the

11  parties' conduct under the circumstances would find the short clause disclaiming the existence of

12  a contract to be inconsistent with the remainder of the agreement, which "looks and sounds like a

13  contract."  (Pl.'s Opp'n to Def.'s  Mot. Summ. J. 13:24-15:25 (citing Judicial Council of

14  California Civil Jury Instructions, 1-300 CACI 302)).

15     In addition, the final paragraph in the disclaimer contains a savings clause,[8] which

16  Schwarzkopf argues would be unnecessary if the document was not intended to be binding.  Even

17  if the Court were to hold that the Quota Letter is not a contract per se, Schwarzkokpf argues that

18  once he began performance, the specific compensation plan became binding and IBM no longer

19  could revoke the plan.  (Pl.'s Reply  to Def.'s Opp'n to Pl.'s Mot. Summ. Adjud. 6:23, fn. 10

20  (citing *Lucian v. All States Trucking Co.*, 116 Cal. App. 3d 972, 976 (Cal. App. 1st Dist. 1981)).

21     IBM contends that the Quota Letter cannot be a contract because the Right to Modify or

22  Cancel clause expressly disclaims contract status, and the Significant Transactions clause creates

23  a measure of uncertainty that precludes contract formation and leaves the Court without any

24  specific terms to enforce.  (Def.'s Mot. Summ. J. 11:21-12:7).  According to IBM, a reasonable

25  person examining the Quota Letter as a whole would understand, in terms plain and simple, that

26

27     [8] The section entitled "**Applicability**" states: In the event any provision of this Disclaimer
    is held to be invalid or unenforceable, the remaining provisions of this Disclaimer remain in full
28  force and effect. (Vinick Decl. In Support of Pl.'s Mot. Summ. Adjud, Exh. L).

1    IBM did not intend the Letter to serve as a binding contract.  IBM contends that the Court need

2    not consider extrinsic evidence, because the intent of the parties is clear from the agreement

3    itself.  (Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. Summ J. 5:2-27).  Even if extrinsic evidence is

4    considered, IBM argues it merely confirms that Schwarzkopf's managers referred him to the

5    Quota Letter and to the Significant Transactions clause to provide "guidance about IBM's

6    incentive system," not to refute its clear intent not to contract.  (*Id.* at 5:8-6:7).

7           In order for an employment agreement to constitute a contract, the terms must be definite

8    enough for the Court to determine the scope of the duty and to provide a rational basis for the

9    assessment of damages.  In *Ladas v. California State Automobile Assn.*, 19 Cal. App. 4th 761

10   (1993), the court upheld a determination that two sales representatives could not show that their

11   employer had any contractual obligation to pay commissions that were "in parity" with those paid

12   to other similarly situated sales agents.  The statements made by the company that it would

13   "consider" industry standards and parity in setting commission rates were too vague to constitute

14   an enforceable agreement.  *Ladas* at 770.  Compared to the precise "unit-value" system set out in

15   the plaintiff's contractual compensation agreement, the company's "amorphous promise" to

16   adjust the unit-value amount based on consideration of industry standards could not "rise to the

17   level of a contractual duty."  *Id.* at 771.  The court found that the nature of the alleged obligation

18   "provide[d] no rational method for determining breach or computing damages."  *Id.*

19          Applying the same general principles of contract formation, the California Supreme Court

20   in *Scott v. Pacific Gas & Electric Co.*, 11 Cal. 4th 454 (1995) reversed an appellate decision that,

21   like *Ladas*, held that PG&E's alleged contractual obligation not to demote employees without

22   good cause was inherently vague.  The court instead agreed with a jury verdict that PG&E had an

23   implied contractual obligation based on "uncontradicted evidence" that PG&E had set forth a

24   detailed discipline policy in its employee manual and other documents, intended to apply the

25   policy to all employees, and expected employees to conform to the policy.  *Scott*, 11 Cal. 4th at

26   461.  In extending the implied-in-fact contract term to PG&E's demotion protocol, the court

27   emphasized that California courts take a "realistic approach to contract interpretation" that is not

28   confined to examining the express agreement, but also looks at "the employer's policies,

10

1   practices, and communications in order to discover the contents of an employment contract." *Id.*

2   at 463.  The court also noted that the principle of implied employment contract terms "has not

3   been confined to the area of wrongful termination."  *Id.* at 464.

4       Thus, the court in *Scott* distinguished *Ladas* on the ground that a finder of fact could

5   rationally assess whether "good cause" existed at the time of demotion, and the documents

6   governing the implied contractual term contained sufficient guidance to render the good cause

7   requirement enforceable.  *Scott*, 11 Cal. 4th at 466.  The court also rejected PG&E's argument

8   that enforcing implied-in-fact contract terms against the employer was unwise as a matter of

9   public policy.  "[E]mployers may benefit from the increased loyalty and productivity such

10  agreements may inspire.... We see no sound reason to exempt the employment relationship from

11  the ordinary rules of contract interpretation which permit proof of implied contract terms."  *Id.* at

12  469 (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 681 (1988)).  At the same time, the

13  court expressly reserved judgment on issues not before it, including "the effect of various types

14  of disclaimers in employment contracts or policy manuals."[9]  *Id.*  at 472.  It emphasized that

15  employers could take comfort that "courts will not enforce vague promises about the terms and

16  conditions of employment that provide no definable standards for constraining an employer's

17  inherent authority to manage its enterprise."  *Id.*  at 473.

18      Read together, *Ladas* and *Scott* do not support Schwarzkopf's argument with respect to

19  contract formation.  As in *Ladas*, IBM's reservation of rights in the Right to Modify or Cancel

20  and Significant Transaction clauses create indefinite terms that provide little guidance for

21  enforcement.  The other sections of the Quota Letter addressing sales territory, quota, and

22  compensation are more specific than the vague promise to "consider parity" in *Ladas*; but each of

23  the relevent terms is conditioned upon the disclaimer that IBM can modify or cancel the plan, or

24

25      [9] The California Supreme Court briefly referenced this issue in *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 fn.23 (1988), noting that several district courts have rejected
26  enforcement of an implied-in-fact contract term when there is a directly contradictory, express
    written provision.  *See, e.g.*, *Crossen v. Foremost-McKesson*, 537 F. Supp. 1076, 1077 (N.D. Cal.
27  1982) ("There cannot be a valid, express contract, and an implied contract each embracing the
    same subject but requiring different results.").
28

Case No. C 08-2715JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY ADJUDICATION
(JFEX2)

1   reduce payout based on its unilateral decision to review a large sale.  Schwarzkopf argues that

2   neither *Ladas* nor *Scott* stands for the proposition that a "Right to Modify or Cancel" clause can

3   convert an otherwise enforceable agreement into "a mere promise by IBM to consider paying

4   commission to Schwarzkopf, or not." (Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. Summ. Adjud.

5   7:15-20).  This may be true, but it misses the point: IBM *did* pay commission to Schwarzkopf,

6   albeit one reduced at the discretion of the company.  *See Scott*, 11 Cal. 4th at 472.

7          In interpreting the purported contract, the Court must try to ascertain the intent of the

8   parties in light of the entire transaction.  *Brobeck*, 602 F.2d at 872.  Even if IBM's "policies,

9   practices, and communications" and purported "offer and acceptance" of the Quota Letter

10  demonstrate some intent that it be binding, *see Scott*, 11 Cal. 4th at 463-64, the unambiguous,

11  express terms of the Quota Letter explicitly deny any intent to contract.  The California Supreme

12  Court addressed a similar set of circumstances in *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317

13  (2000), in which it clarified that any examination of "'the totality of the circumstances' ... to

14  determine whether the parties' conduct ... gave rise to an implied-in-fact contract" takes place in

15  the context of "'courts seek[ing] to enforce the actual understanding' of the parties to an

16  employment agreement." *Guz*, 24 Cal. 4th at 337 (quoting *Foley*, 47 Cal. 3d 654, 677).  In *Guz*,

17  the Court evaluated whether statements in personnel documents constituted triable evidence of an

18  implied-in-fact limitation on an otherwise express disclaimer of any such limitation on the

19  employer's termination procedures.  *Id.* at 338-341.  It concluded that because the employer

20  maintained relevant written policies, there could be "no triable issue of an implied contract on

21  terms broader than the specific provisions of those documents." *Id.* at 345.  The court rejected

22  the Court of Appeal's determination that a triable issue of fact existed with respect to the

23  employer's decision to eliminate Guz's work unit, because the personnel documents "imposed no

24  restrictions upon the company's prerogatives to eliminate jobs or work units, for any reason," and

25  the express policy "confirmed that [the employer] was free to 'reorganize' itself ... and to

26

27

28

Case No. C 08-2715JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY ADJUDICATION
(JFEX2)

1   'initiate' employee 'terminations....'"[10] *Id.* at 347-48.

2          Here, IBM specifically set forth its commission structure in the Quota Letter and provided

3   express disclaimers so as to limit any sales representative's reliance on a specific commission

4   payout for large sales.  As in *Guz*, there is an express written policy or agreement on which both

5   parties purport to rely, and which thereby sets the boundaries for any implied contract.  *See Guz*,

6   24 Cal. 4th at 345.  Any inferences that may be drawn in Schwarzkopf's favor with respect to the

7   circumstances or intent of the Quota Letter are insufficient to negate IBM's clear intent *not* to

8   contract, or its express reservation of discretion that inevitably limits any implied understanding

9   of a promise to pay commission in full.  Therefore even Schwarzkopf's managers' encouraging

10  statements to the effect that he "should be paid in full" and his previous experience receiving full

11  commission under the Incentive Plan cannot imply obligations "broader than the specific

12  provisions" of the express written agreement.  *Id.*

13         Cases from other jurisdictions generally reinforce the conclusion that contract formation

14  does not occur when an employer retains absolute discretion or a unilateral right to modify or

15  cancel employee commission.  *See, e.g.*, *Stinger v. Stewart & Stevenson Servs., Inc.*, 830 S.W.2d

16  715, 720 (Tex. App. 1992)[11] (commission arrangement not contractually binding due to

17  employer's reservation of discretion); *Rakos v. Skytell Corp.*, 954 F. Supp. 1234, 1237-38 (N.D.

18  Ill. 1996) (no contract where defendant "retained the right to modify or cancel the Plan at any

19  time without prior notice" and so did not provide "a clear right to bonus commissions"); *Foss v.*

20  *Am. Tel. & Telegraph Co.*, 605 N.Y.S2d 143, 144 (1993) (language authorizing defendant to

21  "reduce, modify, or withhold compensation or noncash awards based on ... management

22  determination of special circumstances at any time for any reason with or without prior notice"

23

24         [10] The court in *Guz* did find triable issues pertaining to a different aspect of Guz's breach

25  of implied contract claim, where the personnel documents guaranteed certain layoff protections

26  to the affected individuals.  *See Guz*, 24 Cal. 4th at 345-46.

27         [11] The dissenting opinion in *Stinger* found the incentive agreement ambiguous as to

    whether the employer retained absolute discretion based on the presence of contradictory

28  language that "a commission will be paid."  *Stinger*, 830 S.W.2d at 721.

Case No. C 08-2715JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY ADJUDICATION
(JFEX2)

conferred no rights on plaintiff).

In a few cases, courts have held that there is an enforceable contract notwithstanding the employer's discretion to modify or alter a commission arrangement but nevertheless have rejected the plaintiff's breach of contract allegation. *See, e.g., Ferrari v. Keybank Nat'l Assn.*, 2009 WL 35330 *2, 7 (W.D.N.Y. Jan. 5, 2009) (referring to the compensation plan as a "valid and enforceable written employment contract," yet finding no breach of contract where "defendant was unambiguously vested with absolute discretion to modify any and all award allocations"); *Bayliss-Allen v. Cadence Design Systems,* Inc., 2000 WL 1156857 (E.D. Pa. Aug. 16, 2000) (finding the employer properly exercised its "complete discretion" to determine commissions for "mega-deals" under the plan). These cases suggest that retention of unilateral discretion on the part of one party is not determinative of contract formation, but that discretion properly exercised under the agreement will not constitute breach.

At least one appellate court outside the Ninth Circuit has reviewed an IBM employee incentive plan similar to the one at issue here and has held the plan to be non-contractual. In *Jensen v. IBM, Corp.*, 454 F.3d 382, 388 (4th Cir. 2006), the court upheld a summary judgment order in favor of IBM, because the language of the sales incentive plan "manifested its clear intent to preclude the formation of a contract."[12] As in this case, the plan in *Jensen* contained a "Right to Modify or Cancel" provision, which reserved to IBM discretion to cancel or modify the incentive program at any time "up until actual payment has been made under the program." *See id.* at 385. The court held that because IBM retained discretion until the time that it made payment under the plan, "there were no conditions Jensen could satisfy to create a binding contract before IBM decided to pay him." *Id.* at 388.

Two unpublished district court opinions have adopted similar reasoning in subsequent

---

[12] The court in *Jensen* was applying Virginia law, although as the court noted, "the principles of Virginia law are representative of contract law generally." *Jensen v. IBM, Corp.*, 454 F.3d 382, 387 (4th Cir. 2006).

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

claims over IBM sales incentive plans.[13]   In *Rudolph v. IBM*, CV 09-00428 (N.D. Ill. Aug. 21, 2009), the court granted judgment on the pleadings for IBM, finding that Rudolph's breach of contract claim failed as a matter of law because the plan allowed the employer to modify or cancel the compensation agreement at any time.   The plan in *Rudolph* stated that "INDIVIDUAL COMPENSATION PLANS CAN BE MODIFIED OR TERMINATED AT ANY TIME FOR ANY REASON – ON A PROSPECTIVE OR RETROACTIVE BASIS...."   *Rudolph* at * 2 (emphasis in original).   Based on the provision allowing for unilateral modification or termination at any time, the court held that because Rudolph "could not have reasonably believed that IBM made an offer with respect to incentive compensation," there was no enforceable contract.   *Id.* at * 6.   In *Gilmore v. IBM*, CV 09-4155 (C.D. Cal. Dec. 16, 2009), the court also granted IBM judgment on the pleadings, citing the conclusions in *Rudolph* and *Jensen* that IBM's explicit disclaimers of any intent to enter into a contract precluded contract formation.

The incentive plan language in *Jensen* and *Rudolph* is similar but not identical to the language in Schwarzkopf's Quota Letter.[14]   The "Right to Modify or Cancel" provision at issue in this case allows IBM to adjust or cancel at any time "up until any related payments have been earned under its terms." (Vinick Dec. Ex. L).   The provision makes no reference to both prospective and retrospective modification, or to reserving a right to cancel "up until actual payment has been made under the program." *See Rudolph* at *2; *Jensen* at 385.   The more restrictive language in this case may prevent IBM from modifying the terms of the incentive plan

---

[13] Schwarzkopf objects to IBM's request for judicial notice of the two, unpublished district court opinions, *Rudolph v. IBM*, CV 09-00428 (N.D. Ill. Aug. 21, 2009) and *Gilmour v. IBM*, CV 09-4155 (C.D. Cal. Dec. 16, 2009), to the extent that the Court notice any factual findings made by the judges in those cases. The Court agrees that the factual findings are not a proper subject for judicial notice, but it has considered the legal reasoning of the two cases as persuasive authority.

[14] The language of the incentive plan in *Gilmour* appears to be identical to that of Schwarzkopf's 2007 Quota Letter.  The court in *Gilmour*, however, did not attempt to compare the language in the incentive plan before it to that in *Jensen* and *Rudolph*, or to distinguish Virginia and Illinois from California law.

15

once a salesperson "earns" commission by completing a sale; the *Jensen* court recognized as much when it noted that "in the absence of such vesting language, a commission might be earned when the sale is made." *Jensen*, 454 F.3d at 389.  At the same time, the Significant Transaction clause appears to allow incentive payments that are disproportionate to territory or quota amount to be reviewed and adjusted at any point, including after the commission is "earned" by completion of the sale.

While it concludes that no contract was formed, the Court acknowledges the evidence in the record that IBM did not retain absolute discretion in its arrangement with Schwarzkopf, that it individualized the Quota Letter and required its acceptance, and that several managers told Schwarzkopf that he should receive full compensation under the terms of the Plan.  Accordingly, the Court turns to the evidence with respect to Schwarzkopf's contract-based claims.

**B.      If there was a contract, there was no breach**

To establish a breach of contract, Schwarzkopf must show that: (1) he did all, or substantially all, of what the contract required him to do; (2) all conditions required by the contract for IBM's performance had occurred; (3) IBM failed to fulfill its obligations under the contract; and (4) Schwarzkopf was harmed by that failure.  (*See* Judicial Council of California Civil Jury Instructions ("CACI") 305).  The first two elements of Schwarzkopf's claim are not at issue.  With respect to IBM's obligation under the contract, Schwarzkopf argues that "there is ample evidence from which a trier of fact could conclude that IBM failed to appropriately and fairly exercise its discretion to adjust his commission." (Pl.'s Opp'n to Def.'s Mot. Summ. J. 20:9-18).  This same argument serves as the basis for Schwarzkopf's claim that a jury should determine whether IBM breached the covenant of good faith and fair dealing implied in every contract under California law.

IBM argues that even if the Quota Letter could be considered a contract, its terms provided IBM with broad discretion to modify the commission structure or adjust a commission payout for a significant transaction, which is what IBM in fact did.  IBM argues that because the Cisco deal placed Schwarzkopf at 1077% of his quota for the first period of 2007 and involved

16

numerous other employees, a commission payment of over $550,000 was indisputably reasonable.  (Def.'s Mot. Summ. J. 16:11-24 (citing David Decl. ¶¶ 24, 25).)

The Court agrees that Schwarzkopf has failed to raise any genuine issues of material fact with respect to IBM's fulfillment of its obligation under the purported contract.  Schwarzkopf acknowledges that he received $551,647 in commission for his role in the Cisco deal and that he is still employed by IBM.  He does not dispute the fact that the Cisco deal placed him at 1077% over his quota for the relevant period.  Under the Significant Transactions clause, IBM could review and reduce Schwarzkopf's commission if it was disproportionate to: (1) his territory or quota size; or (2) his contribution toward the transaction.  The value of the Cisco deal alone in proportion to Schwarzkopf's quota provided IBM with legitimate grounds under the contract to review and adjust the award.  There is no breach of contract where "defendants were given the right to do what they did by the express provisions of the contract...." *Carma Developers, Inc., v. Marathon Development Inc.*, 2 Cal. 4th 342, 374 (1992).  Schwarzkopf's argument that IBM "failed to appropriately and fairly exercise its discretion to adjust his commission," (Pl.'s Opp'n to Def.'s Mot. Summ. J. 20:8-18), goes to his claim for breach of implied covenant of good faith and fair dealing, but it provides no support for the claim based on the breach of the alleged contract itself.

### C.      There was no breach of the implied covenant of good faith and fair dealing

Under California Law, every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988) (citing Rest. 2d Contracts § 205).  The covenant is "designed to effectuate the intentions and reasonable expectations of the parties reflected by mutual promises within the contract." *Nein v. Host Pro, Inc.*, 174 Cal. App. 4th 833, 852 (2009) (citation omitted).  Its scope is "circumscribed by the purposes and express terms of the contract." *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App 4th 496, 509 (quoting *Carma Developers, Inc., v. Marathon Development Inc.*, 2 Cal. 4th 342, 373 (1992)).  An implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their

17

agreement," *Guz*, 24 Cal. 4th at 349-51.  Whether there has been a breach of the implied covenant is "ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.'" *Hicks* at 509 (quoting *Paulfrey v. Blue Chip Stamps*, 150 Cal. App. 3d 187, 194 (1983)).

Schwarzkopf argues that there are numerous issues of fact which would permit a jury to find that IBM failed to exercise its discretion in good faith and in accordance with the tenets of fair dealing.  He points out that several managers told him that they thought he should be paid in full; he sought out information about his potential commission but was never told that the Significant Transactions clause would apply to him; that the final decision to reduce his commission subject to the "300% Rule" was made without any input as to his individual performance; and that David did not apply the "300% Rule" uniformly to all employees.  (Pl.'s Opp'n to Def.'s Mot. Summ. J. 21:14-22:2 (citing Blackman Dep. Ex. 3, Chandor Dep. Ex. 3; Def.'s Request for Admissions Resp. 30; David Dep. Vol. I at 36:20-24, 79:3-5 and 20:16-21:2).)

IBM contends that none of this evidence is sufficient to raise an issue as to whether it exercised its discretion fairly and in good faith.  IBM relies primarily upon the "undisputed evidence" that Schwarzkopf's low first period quota was greatly disproportionate to the size of the Cisco deal.  It argues that regardless of how Schwarzkopf interpreted the statements from his managers that they thought he "should" receive full commission, it had total discretion to review and adjust commission based upon objective criteria that clearly were met.  (Def.s' Opp'n to Pl.'s Mot. Summ. Adjud. 7:10-9:9).

Although "breach of a specific provision of the contract is not a prerequisite" to a claim under the implied covenant, *Carma*, 2 Cal. 4th at 373, the scope of the implied covenant is dictated by the "purposes and express terms of the contract."  *Id.* (citing *Foley*, 47 Cal. 3d 654, 683).  It is true that "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another [and that] [s]uch power must be exercised in good faith."  *Gabana Gulf Distribution v. Gap Int'l Sales*, 2008 Westlaw 111223 *7 (N.D. Cal. Jan. 9, 2008) (quoting *Carma*, 2 Cal. 4th at 372)).  At the same

18

1    time, the covenant cannot "be read to prohibit a party from doing that which is expressly

2    permitted by an agreement. On the contrary, as a general matter, implied terms should never be

3    read to vary express terms." *Id.* (quoting *Carma*, 2 Cal. 4th at 374).  Stated differently, "the

4    covenant of good faith is read into contracts in order to protect the express covenants or promises

5    of the contract, not to protect some general public policy interest not directly tied to the contract's

6    purposes." *Carma*, 2 Cal. 4th at 373 (citing *Foley*, 47 Cal. 3d at 690).  Under this rubric,

7    Schwarzkopf's evidence is insufficient to raise a material question as to whether IBM violated

8    the implied covenant.  Based on the terms of the Quota Letter, IBM was not required to do more

9    than it did.  As expressed by the court in *Carma*, "[w]e are aware of no reported case in which a

10   court has held the covenant of good faith may be read to prohibit a party from doing that which is

11   expressly permitted by an agreement." *Carma*, 2 Cal. 4th at 374.

12        Schwarzkopf seeks to distinguish this precedent by arguing that those cases in which the

13   court rejected the implied covenant claim as a matter law involved "absolute and unfettered

14   discretion" in the controlling contract, not a lesser degree of discretion that required good faith

15   application. *See Gabana Gulf Distribution*, 2008 Westlaw 111223 at *7 ("California courts have

16   harmonized these two principles in analogous cases by examining whether the contract gives the

17   defendant merely the power to exercise discretion, or whether it gives the defendant the greater

18   power to refrain from acting at all.").  However, while Schwarzkopf's argument is sound in

19   principle, it fails in application.  Although the Quota Letter did not reserve "absolute and

20   unfettered discretion" to not pay any commission at all, neither did IBM seek to avoid paying all

21   commission.  In *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354 (1997), the court found there

22   to be a triable issue of fact whether Warner Brothers exercised its discretion in good faith when it

23   declined to produce any of the plaintiff's films under their "non-exclusive first look" film

24   production deal.  Although Warner Brothers "was entitled to reject Locke's work based on its

25   subjective judgment," it did not have the "express right to refrain from working with Locke."

26   *Locke*, 57 Cal. App. 4th at 364, 367.  Any rejection of Locke's film proposals had to be based

27   upon an honest and good faith exercise of Warner Brothers' discretion. *Id.*

28

1

2    In *McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142 (N.D. Cal. 2002), the court denied

3  summary judgment on several claims stemming from the employer's reassignment of plaintiff's

4  sales account and termination of her employment, resulting in the plaintiff's loss of commission

5  for a large sale she had worked on prior to her termination.  The court found that there was a

6  triable issue as to whether the employer's actions "less than two weeks before the [significant

7  sales deal] was signed" were a bad faith effort to "frustrate plaintiff's legitimate expectations"

8  under her commission agreement.  *McCollum*, 212 F. Supp. 2d at 1153.  And in *Gabana Gulf*

9  *Distribution v. Gap Int'l Sales*, 2008 Westlaw 111223 (N.D. Cal. Jan. 9, 2008), involving a

10 clothing distribution contract, the court found a triable issue of fact as to whether Gap's "freeze"

11 on any and all approvals of Gabana's proposed distribution sites constituted a breach of the

12 implied covenant.  The court analogized Gabana's claim that its proposed retail sites should have

13 been considered on the merits, rather than subjected to a blanket rejection, to Locke's right under

14 her arrangement with Warner Brothers to have her movie proposals considered individually in

15 good faith rather than rejected automatically.  *Gabana*, 2008 Westlaw 111223 at *8.

16    IBM's discretion under the Significant Transactions clause of the Quota Letter is limited

17 by express criteria of proportionality, and like the agreements in *Locke*, *McCollum*, and *Gabana*,

18 does not give IBM discretion to avoid paying Schwarzkopf any commission at all.  But unlike

19 plaintiffs in these cases, Schwarzkopf was not denied entirely the benefit of the agreement, nor

20 was IBM's exercise of discretion outside of  "'any purpose within the reasonable contemplation

21 of the parties at the time of formation.'"  *See Gabana*, 2008 Westlaw 111223 at *8 (quoting

22 *Carma*, 2 Cal. 4th at 372).  To the contrary, Schwarzkopf's agreement with IBM expressly

23 contemplated review and reduction of commission under the enumerated circumstances.

24    The most analogous California case would appear to be *Carma*, in which a lease

25 agreement between two commercial entities required the lessee to obtain written consent from

26 the lessor before assigning or subletting the tenancy and allowed the lessor to terminate the lease

27 upon such a request.  *Carma*, 2 Cal. 4th at 350.  When the lessor exercised its discretion and

28 terminated the lease after refusing permission to the lessee to sublet, the court held that the lessor

20

had not violated the implied covenant of good faith and fair dealing because it was "within the

reasonable expectations of the parties that [the lessor] might terminate the lease upon a proposed

transfer in order to claim for itself appreciated rental value of the premises." *Id.* at 374.

Similarly in *Brandt v. Lockheed Missiles & Space Co., Inc.*, 154 Cal. App. 3d 1124 (1984), the

court held there was no breach of the implied covenant of good faith and fair dealing where

Lockheed had paid an allegedly inadequate amount to two employees for their invention, for

which a patent had been awarded to the company. The terms of Lockheed's employee patent

agreement stated that the company "may, but is not obligated to, grant to the inventor-employee a

Special Invention Award." *Brandt*, 154 Cal. App. 3d at 1130. Noting that the language of the

contract could not be "more clear and explicit," the court reversed a jury verdict in favor of the

employees, each of whom had received $2,500. *Id.*

Schwarzkopf has not produced any evidence of bad faith on the part of IBM. Like the

Defendants in *Carma* and *Brandt*, IBM acted within the bounds of reasonable discretion when it

reduced Schwarzkopf's commission payment to $551,647. Schwarzkopf cannot show that

IBM's ability to reduce his commission based upon having closed a sale disproportionate to his

quota was not a "'purpose within the reasonable contemplation of the parties at the time of

formation.'" *See Gabana*, 2008 Westlaw 111223 at *8 (quoting *Carma*, 2 Cal. 4th at 372). It

was, as expressly stated in the Quota Letter itself, the exact purpose for which the reservation of

discretion under the Significant Transaction clause existed.

### D.   Fraud

To prevail on his fraud claim, Schwarzkopf must establish: (1) a misrepresentation, (2)

made with knowledge of its falsity or without sufficient knowledge to warrant belief in its truth,

(3) with the intent to induce reliance, and (4) which did induce a justifiable reliance (5) causing

damages. *Gabana Gulf Distribution*, 2008 Westlaw 111223 at *9 (N.D. Cal. Jan. 9, 2008). A

representation can take the form of a deceptive answer or use of misleading language, and need

not be a direct falsehood. *Brady v. Carman*, 179 Cal. App. 2d 63, 68 (1960).

Schwarzkopf points to numerous allegedly false representations by his supervisors at IBM

Case No. C 08-2715JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY ADJUDICATION
(JFEX2)

1   that he claims falsely represented that his commission on the Cisco deal would not be "capped"

2   or reduced, upon which IBM knew that he would rely.  For example, Pitts, IBM's Western

3   Region Lotus Business Unit Executive, stated in his deposition testimony that once he realized

4   Schwarzkopf would not be paid in full, he did not tell him "[b]ecause I didn't want to distract

5   him from the deal."  (Pl.'s Opp'n to Def.'s Mot. Summ. J. 22:20-23 (citing Pitts Dep. at 126:2-

6   5).)  Schwarzkopf asserts that based on such representations, he sought to close the deal before

7   the end of the first quota period and to maximize the size of the sale rather than retain some of

8   the software for a separate deal in the second period.

9        IBM argues that none of the alleged statements was knowingly false or otherwise

10   actionable.  First, no one affirmatively told Schwarzkopf that he would receive a full

11   commission.  Several of the statements referred to Schwarzkopf's Quota Letter and to the

12   Significant Transactions clause within it.  IBM also points to the disclaimer attached to the on-

13   line Earnings Estimator, which warned employees not to rely on the estimated incentive payment.

14   Second, IBM argues that Schwarzkopf cannot show that the supportive statements made to him

15   were knowingly false, especially given the evidence that those statements were made before the

16   managers who made them were aware of Schwarzkopf's artificially low quota for that period.

17   Finally, with respect to reliance, IBM argues that the very fact that Schwarzkopf took steps to

18   "lobby" for a full commission indicates that he was aware of the fact that his commission could

19   be reduced.  It contends that Schwarzkopf's claim that he might have split up the Cisco

20   transaction had he known that his commission would be reduced is inadmissible speculation,

21   especially given the fact that multiple people were working on the deal, which was packaged as

22   one large transaction to the benefit of both IBM and Cisco.  (Def.'s Mot. Summ. J. 22:19-23:2

23   (citing Pl. Dep. 171:22-173:6; Chandor Dep. 99:3-100:13; Pitts Dep. 56:17-20).).

24        Schwarzkopf fails to identify any evidence of fraudulent intent on the part of IBM.

25   Nothing in the record suggests that the several managers who encouraged Schwarzkopf's work

26   on the Cisco deal by saying that they "thought" he would receive a full commission actually

27   intended otherwise at the time the statements were made.  *See Gabana*, 2008 Westlaw 111223 at

28   *9 (granting summary judgment on plaintiff's fraud claim because plaintiff did not show that

22

1   Gap did not intend to approve the proposed retail site when it made the allegedly fraudulent

2   statements) (citing *Magpali v. Farmers Group, Inc.*, 55 Cal. Rptr. 2d 225, 231 (Cal. Ct.

3   App.1996) ("A promise of future conduct is actionable as fraud only if made without a present

4   intent to perform.")).  To the contrary, the managers in question emailed upper management in an

5   effort to confirm that Schwarzkopf would be paid in full.  The managers' failure to warn

6   Schwarzkopf that his commission could be reduced irrespective of their efforts speaks more to a

7   failure on the part of IBM to train its managers than to any intent to deceive.

8       Pitts' statement that he failed to alert Schwarzkopf that he might not receive full

9   commission because he didn't want to "distract him from the deal" provides the sole example of

10  a potentially misleading omission.  However, even if this single example were sufficient to

11  support a claim for fraud, Schwarzkopf cannot show justifiable reliance.  As noted previously,

12  several managers referred Schwarzkopf to the disclaimers in the Quota Letter and in the Earnings

13  Estimator within the same time frame, and Schwarzkopf was not the only individual controlling

14  the timing and scale of the Cisco deal.

15          **E.     Promissory Estoppel**

16      "A promise which the promisor should reasonably expect to induce action or forbearance

17  on the part of the promisee ... and which does induce such action or forbearance is binding if

18  injustice can be avoided only by enforcement of the promise."  Rest. 2d Contracts § 90.  Thus, to

19  establish his claim for promissory estoppel, Schwarzkopf must show that (1) IBM made a

20  promise which it knew or should reasonably have expected to induce action on the part of the

21  Schwarzkopf, and (2) upon which Schwarzkopf did in fact substantially change his position by

22  acting in reliance upon it, and (3) that Schwarzkopf's reliance was reasonable under the

23  circumstances.  *See Drennan v. Star Paving Co.*, 51 Cal. 2d 409, 413-14 (1958).

24      This claim fails on the same grounds as Schwarzkopf's fraud claim.  IBM's

25  communications were qualified by its multiple disclaimers, and Schwarzkopf cannot show that

26  he reasonably relied upon or changed his position as a result of those communications.

27          **F.     Unfair Competition Law**

28      California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.,

Case No. C 08-2715JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
CROSS-MOTION FOR SUMMARY ADJUDICATION
(JFEX2)

1  prohibits any "unlawful, unfair, or fraudulent business act or practice." *Kelley v. Mortgage Elec.*

2  *Reg. Sys., Inc.,* 642 F. Supp. 2d 1048, 1055 (N.D. Cal. 2009).   "An act can be alleged to violate

3  any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent." *Berryman v. Merit*

4  *Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007).  The law effectively "'borrows'

5  violations of other laws and treats them as unlawful practices that the unfair competition law

6  makes independently actionable.'"  *Kelley*, 642 F. Supp. 2d at 1055 (citations omitted).

7         Schwarzkopf argues in a conclusory fashion that the evidence with respect to IBM's

8  conduct is "sufficient to allow a trier of fact to conclude that IBM has a pattern and practice of

9  unfairly, unlawfully or fraudulently reducing the sales commissions of employees." (Pl.'s Opp'n

10  to Def.'s Mot. Summ. J. 24:4-7).  Schwarzkopf points out that IBM provides no guidelines or

11  training with respect to implementation of the Significant Transactions clause, Davis apparently

12  implemented the "300% Rule" before it became effective in July 2007, that IBM reduced his

13  commission notwithstanding his supervisors' recommendations, and that there have been

14  multiple law suits filed against IBM based on a failure to pay sales commissions as promised.

15  (*Id.* at 23:18-24:4).  However, Schwarzkopf does not articulate how these facts might sustain a

16  UCL claim separate and apart from his other claims, which as discussed above, do not survive

17  summary judgement.

18                              **IV.  ORDER**

19         Good cause therefor appearing, IBM's motion for summary judgment is GRANTED and

20  Schwarzkopf's motion for summary adjudication is DENIED. The Clerk shall enter judgment

21  and close the file.

22

23  DATED: May 12, 2010

24                                    _____
                                      JEREMY FOGEL
                                      United States District Judge

25

26

27

28

24